IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,          :     CRIMINAL ACTION
                                   :     NO. 11-274-01 & 02
          v.                       :
                                   :
ANTHONY BURNETT &                  :
RAHEEM HANKERSON,                  :
                                   :
     Defendants.                   :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          AUGUST 1, 2012


I.   **INTRODUCTION**

          Defendants Anthony "Ant" Burnett and Raheem Hankerson
were jointly charged by a grand jury as follows: (1) conspiracy
to rob a jewelry store with a firearm in violation of 18 U.S.C.
§ 1951(a), (b)(1), and (b)(3); (2) robbery of a jewelry store
with a firearm in violation of 18 U.S.C. §§ 1951, 1952; (3)
using and carrying a firearm in relation to a crime of violence
in violation of 18 U.S.C. § 924(c)(1), (c)(2); (4) possession of
a stolen firearm in violation of 18 U.S.C. § 922(j).  Defendant
Hankerson was charged by a grand jury with one count of
possession of a firearm by a convicted felon in violation of 18
U.S.C. § 922(g)(1).  Defendant Burnett was also charged by a
grand jury with one count of possession of a firearm by a
convicted felon in violation of 18 U.S.C. § 922(g)(1), (e).

Pending before the Court are both Defendants' motions to suppress.  Defendants filed separate motions to suppress all physical evidence from the search of a car.  See ECF Nos. 35, 44.  Defendant Hankerson also seeks suppression of evidence found at his residence and statements he made to officers while in custody.  See ECF No. 35.  Defendant Burnett also filed a motion seeking to suppress statements he made while in custody.  See ECF No. 36.  On December 16, 2011, and January 20, 2012, the Court held evidentiary hearings.  At the close of those hearings, the Court ordered supplemental briefing on all suppression motions.  Order, Jan. 20, 2012, ECF No. 53.  The Government provided such briefing, as did Defendant Hankerson.  See ECF Nos. 61, 63, 68.  Defendant Burnett, however, did not provide additional briefing.  Before oral argument on Defendants' motions, the Court received Defendant Burnett's Motion to Appoint New Counsel.  ECF No. 72.  The Court granted this request and appointed Michael J. Diamondstein, Esquire, as counsel for Defendant Burnett and afforded Mr. Diamondstein additional time to file supplemental briefing.  ECF No. 73.  After Mr. Dimondstein's appointment, Defendant Burnett moved to

reopen his Motion to Suppress his statement.  ECF No. 82.  The
Court granted this motion.[1]  ECF No. 88.  Accordingly, at this
time only Defendant Hankerson's Motions and Defendant Burnett's
Motion to suppress physical evidence are ripe for disposition.
See ECF Nos. 35, 44, 63.  For the reasons that follow, the Court
will deny those Motions.


II.  **BACKGROUND**[2]

On March 29, 2011, the first defendant[3] entered
Poland's Jewelry at 4347 Main Street, in the Manayunk section of
Philadelphia.  The first defendant, an African-American male,
was disguised in a wig, hat, light coat, and glasses.  A store
clerk was present.  The first defendant produced a semi-

---

[1]    Defendant Burnett's Motion to Suppress his statement
has been rescheduled to allow Defendant Burnett to retain an
expert on the physical and mental effects of morphine.  At oral
argument on the pending motions, Mr. Diamondstein assured the
Court that he was ready, willing, and able to proceed on
Defendant Burnett's Motion to Suppress physical evidence.

[2]    This section constitutes the Court's findings of fact
for purposes of the motions to suppress and is based upon the
testimony offered at two evidentiary hearings, as well as the
unobjected-to documentary evidence submitted in connection with
those hearings.

[3]    From the testimony and documentary evidence offered in
this case, excluding the statements given to police officers by
Defendants, it is not clear which defendant entered the store
first.  Resolution of this issue, however, is not necessary
given that these facts are for background information and not
dispositive here.

automatic gun.  The first defendant forced the clerk to the back of the store where the storeowner was located.  Then, he bound both with plastic zip ties.  At this time, the first defendant called the second defendant.  The second defendant, an African-American male, entered the store and both defendants began plundering the store.  At some time during the robbery, the first defendant went back to check on the victims and struck the owner across the head with the gun.  Next, one defendant left and the other waited in the store until he received a cell phone call, allegedly from the other defendant.  At that time, the second defendant departed the store and the police were notified.  In addition to store merchandise, Defendants also allegedly stole the security tape, a revolver that was kept under the store cash register, and some of the victims' personal effects.  Defendants used pink or beige bags to carry these goods.

Following the robbery, Defendants allegedly fled in a black Honda, with Defendant Hankerson at the wheel.[4]  Unfamiliar with the neighborhood, they became lost and drove down a dead-

---

[4]        The parties do not dispute that Defendant Hankerson drove the Honda.  Indeed, Defendant Hankerson's girlfriend, Shavon Adams, at Defendant Hankerson's insistence, reported the Honda stolen.  His girlfriend, however, changed her mind and told police detectives later that Defendant Hankerson had borrowed her car the day of the robbery.

end street, the 200 Block of Kalos Street.  They arrived at this location, which was about a mile or two from the robbery, approximately five to thirty minutes after the robbery.  Two witnesses saw Defendants arrive.  The first witness stated that the Honda arrived at a high rate of speed, stopped quickly, and then parked on the side of the road.  The first witness saw Defendants placing bags in the trunk from the back seat.  The second witness approached the car, responding to a request from one of the defendants for a ride, and claims to have seen bags in the trunk and that this defendant closed the trunk very quickly upon his approach.  After the second witness refused to provide a ride, Defendants abandoned the car and left its contents there.  One of the witnesses then called 911 to report the incident.

Upon arrival at Kalos Street, Officer Christopher Ward[5] learned of the above details regarding the Honda and that the witnesses identified the Honda's occupants as African-American males, with one wearing a similar coat as described by the robbery victims.  Ward also determined that the Honda was registered to 5812 North Lambert Street, which is approximately twenty to twenty-five minutes away from Kalos Street.  See

---

[5]     Also responding to the Kalos Street incident was Officer Anthony Lynch.  His testimony generally confirms that of Ward.

Suppression Hr'g Tr. vol. 2, 82:7, Jan. 20, 2012, ECF No. 58.
After fruitless attempts to contact the car's owner, the Honda
was towed to the police garage to secure it from both the
elements and possible evidence tampering.  Detective Ted
Wolkiewicz then obtained a search warrant for the Honda and
recovered the stolen jewelry, stolen revolver, a pair of wigs,
sunglasses, plastic zip ties, the security tape, a 9mm pistol
with apparent blood on it, Pennsylvania Board of Probation and
Parole paperwork belonging to Defendant Hankerson that included
various identifying information, and also a wallet with
identification cards belonging to Defendant Hankerson.  As a
result of this identification, a warrant issued to search 5812
North Lambert Street, Defendant Hankerson's residence.

        After finding the evidence in the Honda, an arrest
warrant issued for Defendant Hankerson on March 30, 2011.
Though no federal warrant was outstanding, on April 5, 2011,
Defendant Hankerson turned himself in to Federal Bureau of
Investigation agent John Benham.  Defendant Hankerson was
accompanied by his attorney at this time and made no statements
regarding the robbery to Benham.  After going to the FBI office
with his attorney, Benham contacted the Philadelphia Police
Department explaining that Defendant Hankerson had surrendered
himself.  Without counsel, Defendant Hankerson was transferred

to the Philadelphia Police Department, Northwest Division, at around 7:30 p.m.[6]  Once there, Defendant Hankerson was handcuffed and placed in an interrogation room.  Wolkiewicz, who was assigned to the case, met Defendant Hankerson in the interrogation room.  Wolkiewicz orally advised Defendant Hankerson of his constitutional rights.  The Government contends that Defendant Hankerson waived these rights.  Though Defendant Hankerson mentioned several times during the interview process that his counsel told him to remain silent, he was continually worried about possible retaliation and whether or not to follow his lawyer's advice.  Finally, Defendant Hankerson agreed to tell Wolkiewicz about the incident at about 1:25 a.m. Wolkiewicz advised Defendant Hankerson of his rights in writing, and Defendant Hankerson waived these rights in writing. Thereafter, Defendant Hankerson explained the entire story of the robbery and his connection with Defendant Burnett, alleging that at all times Defendant Burnett threatened to harm Defendant Hankerson's family if he did not assist in the robbery. Defendant Hankerson's statement concluded at around 4:25 a.m.

---

[6]        Benham testified that he offered for counsel to accompany Defendant Hankerson, but that counsel declined. Counsel during this surrender is not the same as currently is representing Defendant Hankerson.

**III. DISCUSSION**

Defendants jointly move to suppress evidence found in the Honda on Kalos Street.  Defendant Hankerson also moves to suppress evidence seized from a search of his residence and to suppress his statement to Wolkiewicz.

A.   Defendants' Motions to Suppress Physical Evidence

Defendants move to suppress all evidence seized from the Honda.  Defendants argue the following with respect to the evidence seized from the Honda: (1) the seizure of the car itself was without probable cause and, therefore, a violation of their Fourth Amendment rights; (2) the search warrant for the Honda was so devoid of probable cause that the Court should find the warrant invalid; (3) the affidavit supporting probable cause was based upon material misstatements; and (4) to the extent that the officers conducting the search of the Honda relied upon the good faith belief that the warrant was valid, such belief was unreasonable.

1.   Standing

As a threshold matter, with respect to Defendant Burnett's Motion to Suppress physical evidence from the search

of the Honda, the Government argues that Defendant Burnett lacks standing to seek such suppression.  As to standing, Defendant Burnett has the burden to show that he had a reasonable expectation to privacy in the Honda.  Rawlings v. Kentucky, 448 U.S. 98, 104 (1980).  There is no dispute that Defendant Burnett was the passenger in the Honda.  The passenger in the car owned by another generally has no standing to challenge the car's search.  United States v. Baker, 221 F.3d 438, 441-42 (3d Cir. 2000); United States v. Pete, No. 09-82, 2010 WL 887364, at *6 (W.D. Pa. Mar. 10, 2010).  Defendant Burnett admits that under the current law he has no standing to challenge the Honda's search.  He argues, however, that it is fundamentally unfair that passengers invited to ride in a car lack standing to challenge the constitutionality of a search of that car.  The Court disagrees.  In any event, the Court is bound by the precedent of the U.S. Supreme Court and the Third Circuit Court of Appeals holding that passengers, absent perhaps some unique facts not present in this case, lack standing.[7]

---

[7]        The Government does not challenge Defendant Hankerson's standing.  And, it appears Defendant Hankerson does have standing.  Although the Honda belonged to Defendant Hankerson's girlfriend, Ms. Adams, she testified that he had permission to use the Honda on the day of the robbery.  See Suppression Hr'g Tr. vol. 1, 24:7-15, Dec. 16, 2011, ECF No. 57. This affirmative grant of permission by Ms. Adams to Defendant Hankerson is sufficient for Defendant Hankerson to have a

2.   Seizure of the Honda

Defendants challenge the initial seizure of the Honda by police.  Specifically, they argue that the police did not have probable cause to seize the Honda, which was lawfully parked on Kalos Street.

In response to a motion to suppress, the Government "bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable."  U.S. v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005). The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV. Evidence obtained pursuant to a warrant that does not comply with Fourth Amendment requirements may be excluded from evidence at trial.  See United States v. Leon, 468 U.S. 897, 906 (1984).

There are several well-delineated exceptions to the exclusionary rule, however.  Indeed, it is hornbook law that the warrantless search and seizure of a car is permitted so long as there is probable cause to believe the car contains contraband.

---

reasonable expectation of privacy in the car.  See Baker, 221 F.3d at 442-43.

Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); see United States v. Burton, 288 F.3d 91, 100-01 (3d Cir. 2002).  When conducting this search or seizure with probable cause, there is no difference between searching the car immediately or seizing the car, bringing it back to the station house, and then searching the car.  See Chambers v. Maroney, 399 U.S. 42, 52 (1970).  Accordingly, Defendants' first argument rises and falls on whether the officers had probable cause to seize the Honda.

     The Court's analysis of probable cause is not limited to the four corners of the affidavit, but includes the police officer's conclusions outside the specific warrant.  Ornelas v. United States, 517 U.S. 690, 696 (1996) (explaining that probable cause should be "viewed from the standpoint of an objectively reasonable police officer.").  From this standpoint, the Court makes a "common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

     Under this standard, Defendants argue that probable cause is lacking because there is no factual nexus to connect the robbery of the jewelry store to the Honda located on Kalos Street.  In particular, Defendants argue that the description of suspects from the robbery contained in the initial police radio

broadcast (the "flash") is so unlike the description of the individuals that in fact exited the Honda on Kalos Street that, should the Court accept the Government's argument, "absolutely any parked vehicle in which two African American males are seen leaving, if found within a two and a half mile radius of a crime and a half an hour later would subject the vehicle to a constitutional seizure under the Fourth Amendment." Def. Hankerson's Supplemental Br. in Supp. of Mot. to Suppress 8, ECF No. 63 [hereinafter Def. Hankerson's Supplemental Br.].

The evidence of record indicates that the fullest description of the robbery suspects is contained in a police broadcast at approximately 11:38 a.m.: "Robbery, point of gun, two black males, number 1 male wearing a wig and yellow coat, both males armed. Number 1 male six feet, gray goatee, yellow coat, tan or beige loafer. Number 2 black male, no further flash. Both males had wigs on. Males carrying a pink bag or beige bag, unknown if they fled on foot or in a vehicle." Id. at 2; Gov't's Ex. 15, at 1.

With respect to the seizure of the Honda on Kalos Street, Ward's testimony is most pertinent.[8]  In uniform, Ward

---

[8]         In terms of the seizure of the car, Wolkiewicz testified that the decision to hold the car was made before he arrived at the scene.  Suppression Hr'g Tr. vol. 1, 101:13-15. Therefore, the evidence of record before his interview of the

responded to the flash information for the robbery and proceeded to the jewelry store.  While there, he received the information about the Honda on Kalos Street.  Within a few minutes, Ward proceeded to Kalos Street in his police vehicle where he interviewed two witnesses to the Kalos Street incident.  His testimony and the Incident Report summarize his interviews with the witnesses on Kalos Street as follows:  The first witness stated that he observed the Honda speed up to the end of Kalos Street and park.  See Gov't's Ex. 13, at 1.  Two African-American males exited the car; one male was wearing a tan jacket and jumped out of the driver's side.  Id.  The second male was a black male, about 5'11", thin build, wearing blue jeans with a black jacket.  Id.  The first male opened the trunk, while the second male threw various items in the trunk.  Id.  Then, both males fled on foot.  Id.  The second witness described one of the Honda's occupants as a black male with a gray "hoodie," about 5'8" – 5'10", 150 pounds, no facial hair, and short black hair.  Id. at 2.  This individual exited the driver's side of the Honda and approached the second witness.[9]  Id.  This

_____

witnesses on Kalos Street is most probative of whether there was probable cause to seize the car.

[9]      The documentary evidence somewhat conflicts with the eyewitnesses' descriptions of the second individual.  Although both individuals apparently exited through the driver's door, the description from one witness was that one of the individuals

individual asked for a ride to Ridge Avenue and Alleghany Avenue because of brake trouble. <u>Id.</u> After the witness refused to give this individual a ride, the witness observed the individual and another walk away. <u>Id.</u> Ward also testified that he ran the license plate of the Honda within five minutes of arriving at Kalos Street, that the license plate came back to a location some twenty to thirty minutes away, and that the Honda was properly registered. <u>See</u> Suppression Hr'g Tr. vol. 2, 74:8-20.

Regarding the timing of events, Ward stated that after he interviewed both witnesses he "notified police radio that this vehicle is involved with the robbery that just occurred, and then . . . notified the detectives." Suppression Hr'g Tr. vol. 2, 63:22-25. Moreover, Ward also testified that the decision to tow the car was made "probably about 20 minutes into it, after detectives were notified." <u>Id.</u> at 78:14-15. Therefore, from the evidence currently before the Court, for probable cause to exist there must have been sufficient evidence from the flash information of the robbery, which Ward heard, and the interviews of the witnesses on Kalos Street to make the

---

wore a black jacket.  The other witness stated that this man wore a gray hoodie.  This difference seems immaterial, as on the whole, both witnesses generally describe the second individual as less than six-feet tall with a thin build and a dark top.

14

conclusion that there was a fair probability that the Honda contained fruits of the robbery.

The Court finds that there was sufficient evidence for the police officers to conclude that the Honda contained fruits of the robbery.  First, Ward heard the flash information from the robbery, stating that there were two African-American males, one with a yellow coat, and that they fled the scene either on foot or in a car with one or more bags of plunder.[10]  As to the occupants of the Honda, in addition to the witnesses' statements to police that the occupants were two African-American males, that they had moved contents from the back seat to the trunk, and the car's high rate of speed, the police also believed that the Honda was the get-away car for several additional reasons. The occupants fit the description of at least one of the robbery suspects, the Honda was one to two-and-a-half miles from the

---

[10]     Another responding officer, Officer Tab Ali, wrote the incident report for the robbery and indicated that the robbers fled on foot, southbound on Main Street.  That conclusion is contradicted by the flash information that specifically says that the method of escape was unknown.  See Gov't's Ex. 15, at 1.  More importantly, the robbery victims could not say anything other than Defendants fled on foot.  The victims were tied up in the rear of the store and all they could observe was Defendants leaving the store on foot.  There appears no way for the victims to conclude one way or the other that Defendants, after leaving the store, fled on foot or in a car.  Indeed, the officers responding to the flash, Ali and Ward, testified to seeing no one walking around Manayunk fitting the description of the robbery suspects.  See Suppression Hr'g Tr. vol. 2, 43:2-9, 58:5-9.

robbery, and the incident on Kalos Street occurred approximately twenty to thirty minutes after the robbery.  This information, combined with the fact that the Honda was registered at an address in a completely different part of town, amounted to probable cause to seize the car.  In sum, from the standpoint of a reasonable officer, given the happenings of the crime, there was a fair probability that the black Honda contained the fruits of the robbery.

Defendants make much of the apparent dissimilarities between the suspects' descriptions reported over the initial flash and Ward's report containing the Kalos Street witnesses' descriptions.  In particular, neither of the witnesses on Kalos Street described the Honda's occupants as having a gray goatee. Yet, what remains from the witnesses' descriptions, which is generally consistent with the flash information, is that there was one African-American male with a tan coat[11] and that there was a second African-American male.  To be sure, this

---

[11]      The flash information indicated this coat was yellow, the Incident Report indicated the coat as light colored, and the witnesses described the coat as tan.  The small discrepancies in the coat's color are immaterial.  Yellow and tan, depending upon the shade, may appear close in color.  It is not as if the robbery suspect's coat color was red, but the Honda occupant's coat color was green.  Such a distinction would be more probative than the small difference in this case.  See McFerguson v. United States, 770 A.2d 66, 74 (D.C. 2001).

16

consistency is not sufficient, without more, for probable cause
to exist to seize the Honda.  See United States v. Kithcart, 134
F.3d 529, 531 (3d Cir. 1998) (holding that "[t]he mere fact that
Kithcart is black and the perpetrators had been described as two
black males is plainly insufficient").  But, other indicia can
provide the sufficient evidentiary support for probable cause.
See United States v. Harple, 202 F.3d 194, 197-98 (3d Cir.
1999); cf. United States v. Lopez, 482 F.3d 1067, 1074 (9th Cir.
2007) ("[I]t is permissible to consider a general physical
description where it is found in combination with other
particularized bases for suspicion.").

     Even the discrepancies in description are not
necessarily fatal.  First of all, the Kalos Street Incident
Report does not indicate that neither of the Honda's occupants
had facial hair.  It states that one of the occupants had no
facial hair.  As to the description of the occupant with the tan
jacket, the report is silent.  See Gov't's Ex. 13, at 1.
Regardless, exact matches in appearance are not required for
probable cause.  See Pasiewicz v. Lake Cnty. Forest Pres. Dist.,
270 F.3d 520, 524-25 (7th Cir. 2001) ("Although Pasiewicz's
appearance did not match exactly the characteristics provided by
the two women, he bore a fair resemblance.  It wasn't as if,
given the description of a fairly good-size man, Pasiewicz

17

looked like a guy who shopped at Napoleon's tailor."); <u>United States v. Avant</u>, No. 91-431, 1992 WL 55827, at *5 (D. Or. Mar. 5, 1992) ("[A]lthough the descriptions of the suspect differed slightly, these differences were no more than would be expected following a bank robbery.").

More to the point, in this case there are several other facts that provide a sufficient nexus between the robbery and the Honda on Kalos Street for probable cause.  First, the occupants of the Honda had bags in their possession that they removed from the Honda's back seat and placed in the trunk. Second, the robbery occurred a short time before the Honda arrived on Kalos Street, by some testimony it was twenty to thirty minutes.  Third, Kalos Street is close in location to the robbery, about one to two-and-a-half miles.  Fourth, the Honda was speeding down a dead-end street sufficiently fast for one witness to want to admonish the driver.  Fifth, after the occupants placed bags in the trunk of the car, they fled down an ally way.  Sixth, the one occupant, who had just <u>stopped</u> abruptly on Kalos Street, told one of the witnesses that he was having brake trouble and needed a ride.  All of these additional facts, despite the discrepancies in description, provide ample evidence for a reasonable officer to conclude, under the totality of the circumstances, "there [was] a fair probability

that contraband or evidence of a crime" was in the Honda.
Gates, 462 U.S. at 238; see Harple, 202 F.3d at 198 (finding
probable cause despite general description of arsonists because
similar car spotted three blocks from fire and finding radios
tuned to police frequency); United States v. Valez, 796 F.2d 24,
25-27 (2d Cir. 1986) (finding probable cause when race, age,
clothing matched description of suspect, suspect was found close
to crime location shortly after crime was committed, despite
witness description that suspect had no facial hair and arrestee
had thick mustache and small beard).  Therefore, the Court finds
that the officers had probable cause both to seize and search
the Honda.  Accordingly, the Court will deny Defendants' Motions
to Suppress the items seized in the search of the Honda.

### 3.  Search of the Honda

In addition to arguing that the initial seizure of the
Honda was illegal, Defendants argue that the search of the Honda
pursuant to the warrant violated their Fourth Amendment rights.[12]

---

[12]    Having concluded that there was probable cause to
seize the Honda, it matters not whether the search was performed
on Kalos Street or later at the station house.  Accordingly,
Defendants' challenge to the sufficiency of the warrant is moot.
Cf. United States v. Chalk, 441 F.2d 1277, 1279 (4th Cir. 1971).
Nevertheless, the Court addresses Defendants' arguments for sake
of completeness.

In this context, Defendants argue that the affidavit used to support the warrant was devoid of probable cause.

An affidavit in support of a search warrant must establish probable cause to believe that evidence of a crime will be found at the particular location, at the time of the search.  Gates, 462 U.S. at 238.  As noted in Gates, "'probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.'"  United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) (quoting Gates, 462 U.S. at 232).  Therefore, "the task of a magistrate is to 'make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  Id. (quoting Gates, 462 U.S. at 238).  The issuing judge need not have based her finding on "direct evidence linking the place to be searched to the crime":

> Instead, probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide the fruits of his crime.  A court is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.

United States v. Hodge, 246 F.3d 301, 305-06 (3d Cir. 2001)
(citations and internal quotation marks omitted).

      The Court must give "great deference" to the probable
cause determination of the issuing judge, and need only conclude
that the magistrate judge had a "substantial basis for finding
probable cause." Id. at 305.  The inquiry is limited to the
facts that were before the issuing judge, that is, the
affidavit, and the "resolution of doubtful or marginal cases in
this area should be largely determined by the preference to be
accorded to warrants." Id. (internal quotation marks omitted).
Given this standard, the question before the Court becomes
whether there was a substantial probability that the magistrate
found within the four corners of the affidavit that there was a
fair probability that the Honda contained fruits of the robbery.
The Court answers that question in the affirmative.

      Defendants fail to make a persuasive argument that
there is no substantial basis for the magistrate's decision.
Defendants argue that the number of witnesses and the assertion
from the affiant that the occupants in the Honda matched the
description of the suspects is insufficient for the magistrate
to conclude there was probable cause.

      Within its four corners, the affidavit provides that
the robbery was committed by two men, that a large quantity of

goods were taken, that approximately five minutes after this robbery a witness saw a black Honda drive at a high rate of speed down Kalos Street and quickly stop, that the same witness saw items from the back of the car being placed in the trunk, and that upon approaching the car, the occupants closed the trunk quickly.  Gov't's Ex. 9, at 2.  Further, the affidavit establishes that the witnesses' descriptions matched those of the suspects, that the car was registered to an owner in another part of town, and not reported stolen.  Id.  Given all of this information, in totality of the circumstances and knowing that the magistrate may draw reasonable inferences from such facts, the Court finds that the magistrate had a substantial basis to find probable cause.

### 4.   Good Faith Reliance on Warrant

Lastly, Defendants argue that any good faith reliance upon the warrant in this case was misplaced.  The "good faith" reliance doctrine provides that a Court need not suppress the fruits of a search pursuant to an otherwise invalid warrant so long as the officers conducting that search relied in good faith upon an issued warrant.  See Hodge, 246 F.3d at 307 ("The test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search

22

was illegal despite the magistrate [judge's] authorization."
(internal quotation marks omitted)). "The mere existence of a
warrant typically suffices to prove that an officer conducted a
search in good faith and justifies application of the good faith
exception." Id. at 307-08 (citing United States v. Leon, 468
U.S. 897, 922 (1984)).  There is no dispute that the search at
the station house was made pursuant to a warrant.  Yet, the
Third Circuit has outlined four limited exceptions when "an
officer's reliance on a warrant is not reasonable." United
States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars
and Fifty-Seven Cents, 307 F.3d 137, 146 (3d Cir. 2002).  These
four exceptions are as follows:

> (1) when the magistrate judge issued the warrant in
> reliance on a deliberately or recklessly false
> affidavit;
>
> (2) when the magistrate judge abandoned his judicial
> role and failed to perform his neutral and detached
> function;
>
> (3) when the warrant was based on an affidavit so
> lacking in indicia of probable cause as to render
> official belief in its existence entirely
> unreasonable; or
>
> (4) when the warrant was so facially deficient that
> it failed to particularize the place to be searched or
> the things to be seized.

Id. (internal quotation marks omitted).  Defendants invoke both
the first and third exceptions to good faith reliance.

a.   <u>Whether the warrant contained material
     misstatements and need for a Franks hearing</u>

First, Defendants argue that Wolkiewicz knowingly or
recklessly provided false information in his affidavit.
Specifically, Defendants argue that the statement from the
affidavit that says, "Both of the males matched the description
of the males involved in the robbery" was false.  <u>See</u> Gov't's
Ex. 9, at 2.  That is, based on the descriptions of the robbery
suspects and the Honda's occupants on Kalos Street described
above, Wolkiewicz's affidavit must be false.  In particular,
there was no description in the flash of the second robber other
than he was an African-American male with white sneakers.  Thus,
even though the witnesses on Kalos Street did describe two
African-American males, only one male could match the
description of the robbery suspects, the male with the tan coat.
And even then, the witnesses never identified a man with a gray
goatee on Kalos Street.

Defendants also assert that there are two other
material misstatements of fact in the affidavit: (1) that the
incident on Kalos Street occurred approximately five minutes
after the robbery; and (2) that Kalos Street was approximately a

mile from the scene of the robbery.  Defendants argue that the
robbery took place at about 11:17 a.m. and the first report of
the Honda on Kalos Street was at 11:48 a.m.  Moreover,
Defendants argue that there is testimonial evidence that Kalos
Street is two-and-a-half miles from Poland Jewelry, not the one
mile provided in the affidavit.  In light of the foregoing,
Defendants request a hearing pursuant to Franks v. Delaware, 438
U.S. 154 (1978), to challenge the veracity of the affidavit.

        The Government argues that Defendants fail to make the
necessary showing for a Franks hearing.  Specifically, the
Government argues that Defendants fail to make any showing with
respect to Wolkiewicz's state of mind.  And, because of this
failure, Defendants are not entitled to a Franks hearing.  See
United States v. Brown, 3 F.3d 673, 677 (3d Cir. 1993).

        A two-step mechanism has been developed in order for a
defendant to overcome the general presumption of validity with
respect to affidavits in support of search warrants.  Franks,
438 U.S. at 171-72; United States v. Yusuf, 461 F.3d 374, 383
(3d Cir. 2006).

        First, in order to be eligible for a hearing, the
defendant is required to make a "substantial preliminary
showing" that the challenged affidavit contained a statement
that was deliberately false or showed a reckless disregard for

the truth, and that such statement was material to a finding of probable cause.  Franks, 438 U.S. at 171; Yusuf, 461 F.3d at 383.  In order to make this preliminary showing, the defendant is required to present an offer of proof contradicting the affidavit, such as sworn affidavits or otherwise reliable witness statements, and is precluded from relying on conclusory statements or a "mere desire to cross-examine."  Franks, 438 U.S. at 171.

Second, if such a Franks hearing is necessary, the defendant must prove by a preponderance of the evidence: "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination."  Yusuf, 461 F.3d at 383, (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997)).

Proving reckless disregard for the truth requires more than a mere showing of "negligence or innocent mistake."  Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000) (quoting United States v. Davis, 617 F.2d 677, 694 (D.C. Cir. 1979)).  The Third Circuit has established the standard for a finding of "reckless disregard for the truth" for both misstatements and omissions as follows:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

Id. at 783.  The defendant ultimately must prove by a preponderance of the evidence that a hypothetical corrected affidavit does not support a finding of probable cause, that is, "that the deficiency in the affidavit was material to the original probable cause finding."  Yusuf, 461 F.3d at 383 (citing Wilson, 212 F.3d at 788).

Two separate but interrelated tests are employed in determining whether the alleged deficiencies are material.  Id. at 383-84.  A court is required to excise an affirmatively false statement from the affidavit, whereas with respect to an omission, the court "must remove the 'falsehood created by an omission by supplying the omitted information to the original affidavit.'"  Id. at 384 (quoting Sherwood, 113 F.3d at 400). Under this standard, at the very least, Defendants must provide sufficient evidence that Wolkiewicz was at least reckless in providing his statements in the affidavit — that is, he must have "entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the

information he reported." Wilson, 212 F.3d at 788 (internal quotation marks omitted).

In this case, the Court finds that Defendants fail to make the required substantial showing. Defendants' argument rests on the affidavit's conclusion that the description of the two robbery suspects and two occupants of the Honda "matched." Defendants argue that the police reports contradict this conclusion because neither of the occupants of the Honda had facial hair, whereas one of the robbery suspects had a gray goatee. As explained above, one robbery suspect was only described as an African-American male with white shoes. The other suspect was an African-American male with a yellow coat or light colored coat. This second suspect was described as approximately six-feet tall, 200 pounds, with a gray goatee. Accordingly, for both suspects at Kalos Street to "match" one had to be an African-American male with white shoes — an admittedly general description — and one had to be an African-American male with a yellow or light jacket, six-feet tall, 200 pounds, with a gray goatee. The Incident Report from Kalos Street shows, as explained above, that the occupants of the Honda were two African-American males. One had a tan jacket on, but had no other descriptive information. The other male was African-American, described as between 5'8" - 5'11" tall,

28

wearing blue jeans and what was described as either a black jacket or gray "hoodie."

What is apparent from this report alone is that one of the two African-American males at Kalos Street was wearing a tan jacket. While such descriptions were not exceedingly detailed, there is enough resemblance for the Court to conclude that Defendants failed to show Wolkiewicz entertained <u>serious</u> doubts as whether the descriptions matched.[13] Moreover, at the suppression hearing, Wolkiewicz was subject to vigorous cross-examination. Defendants point to nothing in this testimony that supports the argument that Wolkiewicz intentionally or recklessly provided false statements in his affidavit. In short, Defendants have simply failed to carry their burden of a "substantial" showing that Wolkiewicz at least entertained serious doubts as to the veracity of the statements in his affidavit.[14] <u>See</u> <u>United States v. Maro</u>, 272 F.3d 817, 822 (7th

---

[13]    Although Wolkiewicz interviewed both the robbery victims and the witnesses on Kalos Street, nothing in the record before the Court shows he memorialized these interviews. Whatever his interviews provided is a point that neither the Government, nor Defendants develop.

[14]    With respect to the alleged false statements regarding the time between the robbery and the incident on Kalos Street and the distance between the robbery and Kalos Street, the record is generally conflicting on both parts. From the record developed in this case, Kalos Street may be one to two-and-a-half miles from the robbery. Specifically, Ward testified that

Cir. 2001) (holding that <u>Franks</u> hearing not necessary even when

conflicting physical descriptions of suspect were omitted from

affidavit and that "[t]hese alleged affidavit shortcomings do

not come close to the kind of egregious errors necessary to

conduct a <u>Franks</u> hearing"); <u>United States v. Mathis</u>, No. 07-266,

2008 WL 1990443, at *12 (S.D. Ohio may 2, 2008) (holding that

<u>Franks</u> hearing not necessary despite "discrepancies in gender

and age" because description in affidavit "generally match[ed]

Defendant's physical characteristics").


   b. <u>Affidavit lacked indicia of probable cause</u>

    Second, and in the alternative, Defendants argue that

the affidavit was "so lacking indicia of probable cause as to

---

Kalos Street was about a mile from the robbery, <u>see</u> Suppression
Hr'g Tr. vol. 2, 67:2-3, whereas Ali testified the distance was
two-and-a-half miles, <u>see</u> <u>id.</u> at 46:22-24.  Moreover, there is
some record evidence to suggest that the robbery occurred around
11:17 a.m., but also evidence to support that it occurred around
11:30 a.m.  Moreover, there is record evidence to support
finding that the Kalos Street incident occurred shortly before
11:48 a.m., which is when the police call came in.  <u>See</u> Gov't's
Ex. 16, at 1.  Therefore, it appears that at its longest, the
time between the robbery and the Kalos Street incident was about
thirty minutes.  The affidavit provides that the robbery began
at 11:33 a.m. and that after the robbery, about five minutes
later, the Honda arrived on Kalos Street.  These small
discrepancies do not move the Court to conclude Defendants made
a substantial showing that Wolkiewicz entertained serious doubts
as to the veracity of his statements in his affidavit.

render official belief in its existence entirely unreasonable."[15]
Ninety-Two Thousand, 307 F.3d at 146.  In essence, Defendants
rehash their argument that within the four corners of the
affidavit there was insufficient evidence to support the
magistrate's finding of probable cause.  Thus, for the reasons
stated above, this argument is unavailing.[16]

      B.   Defendant Hankerson's Motion to Suppress Search of his Residence

Defendant Hankerson also argues that the fruit of
poisonous tree doctrine renders the search of 5812 North Lambert
Street unlawful.  Defendant Hankerson argues that the search of
the Honda provided police with this address for Defendant
Hankerson.  Thus, the illegality of that search taints the
obtaining of the warrant to search his residence, as that
warrant includes information provided from the illegal search.

---

[15]    Defendants' briefing purports to invoke the second
exception to good faith reliance — that the magistrate judge
"abandoned his judicial role and failed to perform his neutral
and detached function."  Ninety-Two Thousand, 307 F.3d at 146.
After reviewing Defendants' argument, however, Defendants are
really invoking the third exception.  Accordingly, the Court
analyzes Defendants' argument under that exception.

[16]    Defendants further argue that all evidence obtained
after the initial illegal seizure of the Honda should be
suppressed because it is the fruit of the poisonous tree.  See
Wong Sun v. United States, 371 U.S. 471, 488 (1963).  Having
concluded that all of the above searches were valid, Defendants
argument fails.

See <u>Wong Sun v. United States</u>, 371 U.S. 471, 487-88 (1963).  As
the Court finds the search of the Honda to be lawful, Defendant
Hankerson's argument fails.  Regardless, Defendant Hankerson
seems to abandon this argument and his challenge to the search
of his residence.  <u>See</u> Def. Hankerson's Supplemental Br. 21 n.1
("[T]he government has indicated that the only evidence that was
retrieved was mail in the name of the defendant and they have
indicated that they do not intend to introduce any evidence at
trial pursuant to . . . that search.").  Accordingly, the Court
will deny Defendant Hankerson's Motion.


        C.   <u>Defendant Hankerson's Motion to Suppress His
             Confession</u>

        In addition to his motion to suppress physical
evidence, Defendant Hankerson also moves to suppress the
statement made to Wolkiewicz while in custody.  First, Defendant
Hankerson argues the statement was obtained after he invoked his
right to remain silent.  Second, he argues that the statement
was the fruit of the poisonous tree.

        Defendant Hankerson argues that the statements made
while in police custody were in violation of his Fifth Amendment
rights and those rights secured under <u>Miranda v. Arizona</u>, 384
U.S. 436 (1966).  He does not challenge that <u>Miranda</u> warnings

32

were given, but argues that shortly after his arrest he invoked

his right to remain silent.  Later in his detention, however,

Defendant Hankerson admits that he did waive this right.

Nonetheless, he argues that because he asserted his right to

remain silent, any renewal of questioning was in violation of

this right.[17]

          Although the Third Circuit has yet to explicitly hold

as much, many other circuits require the invocation of the right

to remain silent to be in line with the standard announced in

Davis v. United States, 512 U.S. 452, 461-62 (1994), in regard

_____

[17]          To the extent that this situation does exist, it is
governed by the four factors from Michigan v. Mosley, 423 U.S.
96 (1975).  Those four factors are as follows:

          (1)  whether  a  significant  amount  of  time  lapsed
          between  the  suspect's  invocation  of  the  right  to
          remain silent and further questioning; (2) whether the
          same  officer  conducts  the  interrogation  where  the
          suspect  invokes  the  right  and  the  subsequent
          interrogation;  (3)  whether  the  suspect  is  given  a
          fresh  set  of  Miranda  warnings  before  the  subsequent
          interrogation;  and  (4)  whether  the  subsequent
          interrogation  concerns  the  same  crime  as  the
          interrogation previously cut off by the suspect.

United States v. Lafferty, 503 F.3d 293, 303 (3d Cir. 2007).
Neither party has briefed how the facts of this case would map
onto such factors.  And, the Court does not reach this issue
because it finds that Defendant Hankerson never invoked his
right to remain silent.

to the invocation of the right to counsel.[18]  Specifically, any
invocation of the right to remain silent must be unambiguous and
unequivocal.  See, e.g., James v. Marshall, 322 F.3d 103, 107
(1st Cir. 2003); Simmons v. Bowersox, 235 F.3d 1124, 1131 (8th
Cir. 2001); United States v. Hurst, 228 F.3d 751, 759-60 (6th
Cir. 2000).  The Court agrees.  Therefore, the Court will
suppress Defendant Hankerson's statement only if he
unambiguously and unequivocally invoked his right to remain
silent.

    Wolkiewicz's testimony is most pertinent for the
Court's assessment of Defendant Hankerson's argument.  In
pertinent part, Wolkiewicz testified that he first encountered
Defendant Hankerson in the interview room at the Northwest
Detective Division around 7:30 p.m.  Suppression Hr'g Tr. vol.
1, 56:23.  Wolkiewicz advised Defendant Hankerson of his Miranda
rights orally, and Wolkiewicz testified that Defendant Hankerson
orally waived his rights.  Id. at 60:20-21.  Defendant Hankerson
allegedly stated at this time that his lawyer advised him not to
speak, but that he (Defendant Hankerson) wished to give a

---

[18]     The Third Circuit has noted that most circuits apply
the Davis standard to the invocation of the right to remain
silent, but thus far has declined to rule on the issue.  See
United States v. Tyree, 292 F. App'x 207, 211 (3d Cir. 2008)
(holding that it need not apply Davis because defendant's
statement "did not even constitute an equivocal invocation of
his right to remain silent").

statement about the robbery, yet was afraid to do so.  Id. at
63:11-18.  Then, over the next several hours, Defendant
Hankerson allegedly repeated this similar phrase over and over.
Finally, around 1:25 a.m. Defendant Hankerson allegedly orally
confessed and signed a photograph of Defendant Burnett
indicating that Defendant Burnett was also involved in the
robbery.  Gov't's Ex. 7, at 5.  Then, at 1:45 a.m. Wolkiewicz
provided Defendant Hankerson with written Miranda warnings,
Defendant Hankerson waived his rights in writing, and provided a
written confession.  Id. at 2.  During Wolkiewicz's questioning
regarding Defendant Hankerson's written waiver, he asked the
following questions: "When you arrived at Northwest Detectives
you initially told me your attorney told you not to talk with
us.  Is that correct? . . .  You have since changed your mind
and decided to be interviewed about this incident.  Is that
correct?"  Id.  Defendant Hankerson answered "Yes" to both
questions.  Id.  These answers, Defendant Hankerson argues,
demonstrate that he did invoke his right to remain silent and
that Wolkiewicz acknowledged this right.

        With regard to this alleged invocation of his right to
remain silent, Defendant Hankerson's only evidence of this
invocation are Wolkiewicz's questions and Defendant Hankerson's
answers.  There is no evidence of record that Defendant

35

Hankerson unambiguously and unequivocally invoked his right to
remain silent.  Indeed, Wolkiewicz testified that Defendant
Hankerson initially waived this right and repeatedly stated that
he wished to speak with Wolkiewicz, but only hesitated because
he feared for his safety.

Further, the questions and answers themselves belie
Defendant Hankerson's argument.  Defendant Hankerson only told
Wolkiewicz that his lawyer told him not to speak with
Wolkiewicz.  This advice of counsel does not serve as an
invocation of the right to remain silent.  Moreover, even if
Defendant Hankerson's lawyer did so advise him, there is no
indication in the record that Defendant Hankerson told
Wolkiewicz that he was going to follow his lawyer's advice.  To
the contrary, Wolkiewicz testified explicitly that Defendant
Hankerson stated he did not want to follow his lawyer's advice.
This hardly amounts to a "clear[ ] request [by Defendant
Hankerson] that all further questioning cease" as required by
Davis and its progeny.  United States v. Ramirez, 79 F.3d 298,
305 (2d Cir. 1996) (internal quotation marks omitted).
Accordingly, the Court finds, in line with Davis's requirement
for an unambiguous and unequivocal invocation of the right to
remain silent, that Defendant Hankerson did not invoke this
right.

36

In addition, Defendant Hankerson argues that his confession was in violation of 18 U.S.C. § 3501 and Corley v. United States, 556 U.S. 303 (2009).  Specifically, Defendant Hankerson argues that because he did not confess within six hours of his detention, and the delay past this six-hour time limit was unreasonable, the Court must suppress his confession. Section 3501(c) provides:

> [A] confession made or given by a person who is a defendant . . . while such person was under arrest or other detention . . . shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer . . . if such confession was made or given by such person within six hours immediately following his arrest or other detention . . . .

18 U.S.C. § 3501(c) (2006).[19]  Defendant Hankerson argues that he invoked his right to remain silent before his written confession.  Then, after deciding to provide a confession, there

---

[19]      Section 3501(c) also provides for an exception to this rule:

> [T]he time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501(c).

was not a knowing, intelligent, and voluntary waiver of his
right to remain silent before his oral confession at 1:25 a.m.
Moreover, his written confession began at 1:45 a.m. and did not
conclude until shortly after 4:25 a.m.  Therefore, Defendant
Hankerson's confession, whether oral or written, is inadmissible
due to delay.

      Defendant Hankerson's argument fails.  See United
States v. Alvarez-Sanchez, 511 U.S. 350 (1994).  Alvarez held
that state custody and confessions do not trigger the prompt
present requirement from McNabb v. United States, 318 U.S. 332
(1943), and Mallory v. United States, 354 U.S. 449 (1957), as
that requirement was modified by § 3501(c).  Alvarez, 511 U.S.
at 358.  Corley did nothing to alter the holding in Alvarez, but
only held that § 3501 modified the McNabb-Mallory prompt
presentment requirement as that requirement relates to federal
custody.  See United States v. Smith, No. 08-569, 2009 WL
2229332, at *2 (E.D. Pa. July 23, 2009).  At the time of his
confession, Defendant Hankerson was in state custody on state
charges.  There was no federal warrant for his arrest at that
time.  Accordingly, Defendant Hankerson's argument that his
confession was due to unreasonably delay is unavailing.  Because
Defendant Hankerson never invoked his right to remain silent and

his confession did not run afoul of <u>Corley</u>, the Court will deny
Defendant Hankerson's Motion.[20]


**V.   CONCLUSION**

For the reasons set forth above, the Court will deny
Defendants' Motions to Suppress.  An appropriate order will
follow.

---

[20]      Defendant Hankerson, in the alternative, argues that
his confession was the result of the illegal search and seizure
of the black Honda.  As the Court concluded that the search of
the Honda was constitutional, this argument fails.